IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER M. CALO II, | ) | CASE NO. 5:24-CV-02211-DAR |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DAVID A. RUIZ |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JONATHAN D. GREENBERG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff, Christopher M. Calo, II ("Plaintiff" or "Calo"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying his applications for child's insurance benefits under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

On March 23, 2022, Calo filed an application for SSI. (Transcript ("Tr.") 86, 233) On May 13, 2022, Calo filed an application for child's insurance benefits. (*Id*. at 75, 226.) In both applications, Calo alleged a disability onset date of April 16, 2002 and claimed he was disabled due to autism, ADHD, OCD, depression, anxiety, apnea, asthma, eczema, mass on liver, insomnia, pandas, and sleep apnea.  (*Id*. at 75, 86, 226.)  The

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

applications were denied initially and upon reconsideration, and Calo requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 125-128, 130-133, 137-139, 141-143.)

On October 31, 2023, an ALJ held a hearing, during which Calo, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 37-73.)  On November 16, 2023, the ALJ issued a written decision finding Calo was not disabled.  (*Id*. at 10-24.)  The ALJ's decision became final on November 8, 2024, when the Appeals Council declined further review.  (*Id*. at 1-3.)

On December 19, 2024, Calo filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7, 9, 10.) Calo asserts the following assignment of error:

> (1) Is the RFC finding of the ALJ supported by the evidence, and was the rejection of Plaintiff's treating physician's opinion legally sufficient?

(Doc. No. 7.)

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Calo was born in 2002 and was 21 years-old at the time of his administrative hearing (Tr. 40), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  He has a high school education.  (Tr. 23.)  He has no past relevant work.  (*Id*.)

**B.      Relevant Medical Evidence[2]**

On August 12, 2011,[3] Calo visited the emergency department because he heard voices telling him to poke his eyes and also poke his dog's eyes. (*Id*. at 426.) He also claimed to see bugs and feel them crawling on his skin. (*Id*. at 427.)

On September 7, 2011, Calo underwent an initial psychiatric evaluation. (*Id*. at 456.) The evaluation noted he had been diagnosed with ADHD and autism. (*Id*.) He was not taking any medications. (*Id*.) He was homeschooled at the time because he did not get along with kids in the regular classroom and preferred to work alone. (*Id*.) He was doing well academically. (*Id*.) He "tries to get along with everybody" and is doing certain social activities to be with other children. (*Id*.) He receives speech and occupational therapy. (*Id*. at 457.) A mental status exam revealed congruent affect, good mood, cooperative behavior, no hallucinations, no paranoia, no delusions, goal directed and logical thought process, intact cognition, and fair insight and judgment. (*Id*.) Calo was assessed with autism, ADHD, and anxiety. (*Id*.) His coping skills and social skills were noted as deficient. (*Id.*) He was referred to a social skills group, started a medication, and "limit setting" was discussed with his parent. (*Id*. at 458.)

On September 29, 2011, Calo presented for counseling/psychotherapy. (*Id*. at 470.) "Mood/affect", "thought process/orientation", "behavior/functioning" were each unremarkable. (*Id*.) Calo complained of unwanted often violent thoughts approximately ten times per day for the past year. (*Id*.) The thoughts have not led to harm to himself or others. (*Id*.) The therapist suggested laughing at or shrugging off the thoughts. (*Id*.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3] While Calo alleges disability beginning at birth (Tr. 226), the Court recognizes Calo did not become eligible for child disability benefits until April 15, 2020, making the start of the relevant period April 15, 2020. The Court nonetheless includes medical records predating April 15, 2020 for a complete picture.

On October 26, 2011, Calo was making "steady progress" with the intrusive thoughts. (*Id*. at 467.) His ADHD symptoms were increasing. (*Id*.)

On March 1, 2012, Calo presenting for counseling/psychotherapy. (*Id*. at 463.) Calo reported his OCD symptoms, including unwanted thoughts, bothered him"24/7". (*Id*.)

On March 5, 2012, Calo presented for psychiatric treatment. (*Id*. at 480.) He reported an increase in OCD handwashing, increased need to hug people to prevent harm to them, nightmares, and reported "he is fighting the devil." (*Id*.)

On May 30, 2012, Calo presented for psychiatric treatment. (*Id*. at 477.) Calo reported increased OCD, increased worrying about germs, and hitting his mom when frustrated. (*Id*.)

On July 7, 2014, Calo was seen by Dr. John Duby, with a chief complaint of obsessive thoughts. (*Id*. at 421.) The severity was noted as "moderate." (*Id*. at 422.) He noted intermittently feeling down and depressed, had occasional thoughts of hurting himself, never had hurt himself, and had no plan to hurt himself. (*Id*.) Dr. Duby recommended counseling and a trial of Prozac. (*Id*. at 423.)

On November 4, 2014, Calo's mother requested a refill of Ritalin. (*Id*. at 418.) Calo was also taking Strattera and Prozac at the time. (*Id*.)

On April 15, 2020, Calo presented for a medication management appointment. (*Id*. at 606.) He was discharged from counseling as of March 2, 2020. (*Id*.) The provider noted Calo was doing "online piano visits", was upset he could not see his friend tomorrow on his birthday, was doing well in online school, rated his depression a two out of ten with no panic attacks. (*Id*.) He had no thoughts of self-harm and OCD was under control. (*Id*.) He did not like being stuck at home due to COVID because he "can't go out bowling and see his friends." (*Id*. at 607.) His OCD regarding germs had "significant improvement" with mom reporting "rare" episodes where he wipes off all the doorknobs. (*Id*.)  Calo was in eleventh grade at an online school and reported all A's and B's with an Individualized Education Plan in place. (*Id*.) His ADHD

4

symptoms included inattention to details, difficulty maintaining attention, difficulty organizing tasks, forgetful, fidgets or squirms, and talks excessively. (*Id*.) A mental status exam revealed he maintained good eye contact, had appropriate speech, was calm and cooperative, had logical thought processes and associations, reported no delusions or hallucinations, he had good insight, judgment, concentration and memory, he had euthymic mood and appropriate affect. (*Id*. at 608.)

On June 17, 2020, Calo presented for a medication management appointment. (*Id*. at 602.) He continued his current medication regimen. (*Id*.) He was not attending therapy at this time. (*Id*.) He reported finishing online school well, depression was a two out of ten, and he played virtual games with his friends. (*Id*.) He reported his OCD did not interfere with daily life and he was doing "pretty good". (*Id*. at 603.) A mental status exam revealed normal speech, he was cooperative and calm, had logical thought processes and associations, reported no delusions or hallucinations, euthymic mood, appropriate affect, good fund of knowledge, and good insight, memory, judgment and concentration. (*Id*. at 604.) His medications were not changed. (*Id*.)

On June 9, 2021, Calo was seen for a medication management appointment. (*Id*. at 593.) He was last seen in May 2021 when he stopped Ritalin and started Jornay. (*Id*.) He reported struggling to focus at school yet maintained A's and B's. (*Id*.) He reported talking to friends on the phone and that one friend came over recently. (*Id*.) He stated he has no desire to leave the house, he just wants to sit and play video games, even with friends. (*Id*. at 594.) He gets overwhelmed going to the store. (*Id*.) His anxiety is an eight to nine out of ten when he is out in public. (*Id*.) He plays piano, makes music, writes music, and raps. (*Id*.) He graduated from his online high school. (*Id*.) He got low scores on the ACT/SAT, so was thinking of getting a job rather than pursuing college. (*Id*.) A mental status exam revealed good eye contact and speech, calm and cooperative behavior, local thought processes and associations, no delusions or hallucinations, euthymic

5

mood, appropriate affect, good fund of knowledge, memory, insight, judgment, and concentration. (*Id.*) His medications were increased to address ADHD and OCD/anxiety symptoms. (*Id.* at 596.)

On August 11, 2021, Calo was seen for a medication management appointment. (*Id.* at 567.) He reported a lesion on his liver, feeling very tired lately, staying social with friends by attending graduation parties and organizing his own graduation party. (*Id.* at 568.) His sister had to force him to go to the movies and garage sales. (*Id.*) She got him a drone and his dad bought a metal detector to get him to go outside. (*Id.*) His anxiety is a six out of ten. (*Id.*) His OCD was "under control". (*Id.*) His mom reported he wants to work at the local grocery store and will apply in the fall. (*Id.*) A mental status exam revealed good eye contact and speech, calm and cooperative behavior, logical thought processes and associations, no delusions or hallucinations, difficulty with sleep, euthymic mood, appropriate affect, good fund of knowledge, memory, judgment, concentration, insight, and judgment. (*Id.* at 570.) His medications were not changed. (*Id.*)

On September 22, 2021, Calo presented for a medication management appointment. (*Id.* at 561.) He reported trouble sleeping, no OCD symptoms, anxiety from lack of sleep was a six to seven out of ten with no panic attacks in the last month, and no depression noted. (*Id.* at 562.) He expressed wanting to work at the grocery store Giant Eagle and wanting to obtain his drivers license and a car. (*Id.*) He has been very tired and naps throughout the day. (*Id.*) He had fun at his graduation party and is staying social with friends. (*Id.*) A mental status exam revealed good eye contact, normal speech, calm and cooperative behavior, logical thought processes and associations, no delusions or hallucinations, euthymic mood, appropriate affect, good fund of knowledge, memory, insight, judgment, and concentration. (*Id.* at 564.) His medications were changed because insurance no longer covered one of the medications. (*Id.*)

On December 14, 2021, Calo presented for a telehealth session. (*Id.* at 556.) He complained of problems with depression and insomnia and thought it was because he was out of his OCD medication. (*Id.*

6

at 556-57.) He reported living at home with his parents. (*Id*. at 557.) Mom stated that he does not go anywhere and doesn't want to leave the house. (*Id*.) He has had mood changes since he has been off his medication. (*Id*.) He has social media anxiety, so his mom made him get off social media. (*Id*.) He rated his depression a ten out of ten.  (*Id*.) He rated his anxiety an eight out of ten. (*Id*.) He had an anxiety attack, the first one he had had in years. (*Id*.) He was not currently in counseling but agreed he should be. (*Id*. at 558.) A mental status exam revealed intermittent eye contact, normal speech, pacing and handwringing, concrete thought processes, logical associations, no delusions or hallucinations, poor sleep, anxious mood, depressed affect, good fund of knowledge, fair memory, insight, judgment, and concentration. (*Id*. at 559.) His medications were changed. (*Id*. at 559.) The provider discussed alternative treatments like exercise, counseling, and relaxation techniques. (*Id*. at 560.)

On February 1, 2022, Calo presented for a telehealth session. (*Id*. at 552.) His chief complaints were anxiety, depression, and sleep. (*Id*.) He reported not having any anger or impulsive behaviors, able to focus and get things done, medication dosage change has made a difference in his mood, and he reported no depression or anxiety. (*Id*.) He rated his depression and anxiety both as a one out of ten. (*Id*. at 553.) His days and nights are mixed up regarding his sleep. (*Id*.) A mental status examination revealed intermittent eye contact, normal speech, quiet, calm, and cooperative behavior, logical thought processes and associations, no delusions or hallucinations, euthymic mood, congruent affect, good fund of knowledge, fair memory, insight, judgment, and concentration. (*Id*. at 554.) His medications were not changed. (*Id*. at 555.)

On May 12, 2022, Calo presented for a telehealth session. (*Id*. at 544.) His chief complaints were anxiety, depression, and sleep. (*Id*.) He underwent a sleep study to determine he has sleep apnea, but he was unable to sleep with the sleep apnea machine on because it increased his anxiety. (*Id*.) He celebrated his 20th birthday by getting a tattoo, going out to a Mexican restaurant, and having ice cream. (*Id*. at 545.) He has been going for walks outside. (*Id*.) His mood was fine, no worsening OCD, and denied any depression. (*Id*.)

7

He was still sleeping a lot. (*Id.*) A mental status examination revealed intermittent eye contact, normal speech, calm, talkative, cooperative behavior, logical thought process and associations, no delusions or hallucinations, euthymic mood, congruent affect, good fund of knowledge, fair memory, insight, judgment, and concentration. (Id. at 546.) His medications were not changed. (*Id.*)

On July 26, 2022, Calo presented for a telehealth session. (*Id.* at 536.) His chief complaints were anxiety, depression, and sleep. (*Id.*) He reported interacting with family, being resistant to go out of the house, and going to Kalahari over the weekend for his mom's birthday. (*Id.* at 537.) He gets upset about not having a girlfriend. (*Id.*) His only interest is playing video games. (*Id.*) He has no motivation, will go days without taking a shower, and complains about chores like helping with the dogs and trash. (*Id.*) A mental status examination revealed intermittent eye contact, normal speech, calm, talkative, cooperative behavior, logical thought process and associations, no delusions or hallucinations, depressed mood, congruent affect, good fund of knowledge, fair memory, insight, judgment, and concentration. (*Id.* at 538.) Medications were not changed. (*Id.* at 539.) The provider encouraged Calo to pick one activity he is interested in to get him out of the house and socializing, to restart walking with his family, and to learn to drive. (*Id.*)

On September 19, 2022, Calo presented for a telehealth session. (*Id.* at 532.) His chief complaints were anxiety, depression, and sleep. (*Id.*) He reported having a girlfriend that he talked to daily. (*Id.* at 533.) He met her and her parents. (*Id.*) He was excited to go to her homecoming dance with her. (*Id.*) He reported feeling happier than he was before, with some OCD thoughts re breaking up with her even though he doesn't want to. (*Id.*) He reported no anxiety attacks despite getting out of the house more often. (*Id.*) He got his "temps" but had no desire to drive or get his license. (*Id.*) He was not attending counseling at this time. (*Id.*) A mental status examination revealed good eye contact, normal speech, calm, talkative, cooperative behavior, logical thought process and associations, no delusions or hallucinations, anxious mood, congruent affect, good fund of knowledge, good memory, fair insight, improving judgment, and good concentration.

8

(*Id*. at 534.) His medications were changed to increase his medication for "OCD/anxiety/depression." (*Id*. at 535.)

On January 12, 2023, Calo presented for a telehealth session. (*Id*. at 944.) His chief complaints were OCD, anxiety, and depression. (*Id.*) He reported having issues with depression about not having money, having obsessive thoughts about breaking up with his girlfriend, and stress over his disability claim being denied. (*Id*.) He was still seeing his girlfriend. (*Id*. at 945.) They went bowling once but he got tired and wanted to go home early. (*Id*.) Her whole family came over to visit. (*Id*.) He reported increased anxiety and depression, and that he was frustrated more easily especially "over the social security stuff." (*Id*.) He still has sleep problems, and his mom reported that he is on the phone until 3:00 a.m. (*Id*.) A mental status examination revealed intermittent eye contact, slow speech, handwringing, quiet, withdrawn, talkative, cooperative behavior, logical thought process and associations, no delusions or hallucinations, anxious mood, depressed affect, good fund of knowledge, fair memory, insight, judgment, and concentration. (*Id*. at 946.) His medications were changed. (*Id*. at 947.)

On February 8, 2023, Calo presented for a telehealth session. (*Id*. at 948.) His chief complaint was OCD, anxiety, and depression. (*Id.*) He reported a reduction in obsessive thoughts, and still having anxiety over wanting to meet people and make friends as well as worrying about family and finances. (*Id*.) He joined a Zoom social group through the Autism Society of Greater Akron. (*Id*. at 949.) He described plans to meet up with a male next week to go to dinner. (*Id*.) He broke up with his girlfriend and reported being "much happier." (*Id*.) His anxiety is high due to family issues, illnesses, and finances. (*Id*.) A mental status examination revealed good eye contact, normal speech, quiet, rocking, restless, talkative, and cooperative behavior, logical thought process and associations, no delusions or hallucinations, anxious mood, congruent affect, good fund of knowledge, fair memory, insight, judgment, and concentration. (*Id*. at 950.) His medications were changed. (*Id*. at 951.)

On April 8, 2023, Calo visited the emergency department due to a reaction to a new medication. (*Id*. at 781.) He was discharged the same day as stable. (*Id*.)

On April 10, 2023, Calo presented to the emergency department with anxiety and a urinary problem. (*Id*. at 750.) He was discharged the same day as stable. (*Id*.)

On May 17, 2023, Calo presented for a telehealth session. (*Id*. at 965.) His chief complaints were anxiety, OCD, agoraphobia, and mood. (*Id*.) He reported having panic attacks. (*Id*.) He had a cookout for Mother's Day, went out "garage saling", went to dinner at a restaurant with his sister and had a drink. (*Id*. at 966.) He described having a "breakdown" where he was crying and yelling and hit the wall because he stubbed his toe. (*Id*.) He was having panic attacks daily and now goes about five days at a time without one. (*Id*.) A mental status examination revealed fair eye contact, normal speech, rocking, restless, talkative, dramatic, cooperative behavior, logical thought process and associations, no delusions or hallucinations, anxious mood, congruent affect, good fund of knowledge, fair memory, insight, judgment, and good concentration. (*Id*. at 967.) His medications were changed. (*Id*. at 968.)

On June 7, 2023, Calo presented for a telehealth session. (*Id*. at 970.) His chief complaints were anxiety, OCD, agoraphobia, and mood. (*Id*.) He reported a medication helping him stay up during the day. (*Id*.) His parents expressed frustration that they are unable to "ease his suffering." (*Id*. at 971.) He reported panicking, OCD thoughts re suicide but that he loves his life, parents, sister, "everyone". (*Id.*) He has attended one counseling session. (*Id*.) A mental status examination revealed good eye contact, normal speech, handwringing, rocking, restless, talkative, dramatic, and cooperative behavior, circumstantial thought processes, logical associations, no delusions or hallucinations, improved sleep, anxious mood, congruent affect, good fund of knowledge, memory, and concentration, fair insight and judgment. (*Id*. at 972.) His medications changed. (*Id*. at 973.)

10

On July 20, 2023, Calo presented for a telehealth session. (*Id.* at 980.) His chief complaints were agoraphobia, panic, anxiety, mood instability – depression and agitation. (*Id.*) He reported feeling depressed, having panic attacks a few times per month, having nightmares, and getting angry and irritable. (*Id.* at 981.) A mental status examination revealed good eye contact, normal speech, rocking, restless, talkative, dramatic, cooperative behavior, tangential thought processes, logical associations, no delusions or hallucinations, anxious mood, depressed affect, good fund of knowledge, memory, and concentration, fair insight and judgment. (*Id.* at 982.) His medications were changed. (*Id.*)

On July 26, 2023, Calo presented for a psychological evaluation. (*Id.* at 1151.) His symptoms were rated on a scale of 1-4. (*Id.* at 1152.) "Withdrawal" was rated "3-4" (severe-extreme) and "anxious" was rated a "3" (severe). (*Id.*) The psychologist assigned a global assessment of functioning (GAF) score of 35-45. (*Id.*)

On August 16, 2023, Calo presented for a telehealth session. (*Id.* at 1107.) His chief complaints were agoraphobia, panic, anxiety, and mood instability – depression and agitation. (*Id.*) He reported posting his music on an online application. (*Id.* at 1108.) Someone reached out to him to sing in front of over 700 people a couple of days ago. (*Id.*) He writes his own music and raps. (*Id.*) He makes his own music digitally. (*Id.*) He feels angry about everything, but when refocused, he is able to calm, smile, and relax while proudly sharing about writing and performing his own music. (*Id.*) A mental status exam revealed good eye contact, normal speech, rocking, restless, talkative, dramatic behavior, circumstantial thought processes, logical associations, no delusions or hallucinations, anxious mood, irritable affect, good fund of knowledge and memory, fair insight, judgment, and concentration. (*Id.* at 1109.) His medications remained the same. (*Id.*)

On September 5, 2023, Calo presented to the emergency department due to suicidal thoughts. (*Id.* at 1020.) He stated he does not want to act on the thoughts, but they are present. (*Id.*) Calo was discharged the same day in stable conditions. (*Id.* at 1029.)

11

On September 6, 2023, Calo presented in-person for a psychiatry appointment. (*Id.* at 1112.) He reported a major panic attack with suicidal thoughts, and bad anger. (*Id.*) A mental status examination revealed good eye contact, normal speech, handwringing, restless, talkative, dramatic, cooperative behavior, circumstantial thought processes, logical associations, no delusions or hallucinations, anxious mood, depressed affect, good fund of knowledge, fair memory, insight, judgment, and concentration, dangerous thoughts but denied intent. (*Id.* at 1115.) His medications were changed. (*Id.*)

On October 11, 2023, Calo presented for a telehealth counseling appointment. (*Id.* at 1132.) He reported panic attacks triggered by OCD, mood problems including anger outbursts, anxiety, fear and worry, sleep problems, suicidal thoughts, and difficulty engaging socially. (*Id.*) A mental status examination revealed appropriate behavior, normal speech, anxious mood, congruent affect, fair insight, good judgment, intact memory, distractible concentration, and appropriate thought content. (*Id.*) The therapist offered deep breathing exercises, which Calo reported improvement after the exercise. (*Id.* at 1133.) Progress notes from this provider indicate Calo was "progressing" toward objectives. (*Id.* at 1138, 1141, 1144.)

## C.    State Agency Reports

### 1.    Mental Impairments

On November 20, 2022, Aracelis Rivera Castro, PsyD., reviewed the claim file and opined that Calo had moderate limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* 83, 94-95.) Castro also found Calo had moderate limitations in his ability to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. (*Id.* at 84, 95.)

12

On March 19, 2023, on reconsideration, Courtney Zeune, PsyD., confirmed Dr. Castro's findings. (*Id*. at 106, 116.)

### 2.    Physical Impairments

On November 29, 2022, Mehr Siddiqui, M.D., reviewed the file and opined Calo could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, and sit for about six hours in an 8-hour workday. (*Id*. at 81-82.) Dr. Siddiqui noted no postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 82.)

On March 11, 2023, on reconsideration, Leon Hughes, M.D., confirmed Dr. Siddiqui's findings. (*Id*. at 104-05, 114.)

### D.    Hearing Testimony

During the October 31, 2023 hearing, Calo testified to the following:

- He has pet dogs and fish. (*Id*. at 46.) He helps care for them by taking them outside. (*Id*.) His parents are both home with him during the day. (*Id*.) They help him with necessities like food and clothing. (*Id*. at 47.) He does laundry and puts dishes away to help out around the house. (*Id*.) He believes he couldn't handle more intense work than that because he gets stressed out and has panic attacks. (*Id*.) He does not drive because his "ADHD concentration just won't allow [him]". (*Id*. at 47-48.) When he tried to drive, he almost hit a car because he couldn't pay attention, and his dad had to pull the steering wheel. (*Id*. at 59.) It led to him having a "breakdown" and his dad had to drive home. (*Id*.)

- He graduation from high school and received grades As and Bs. (*Id*. at 48.) He had an IEP that gave him extended time. (*Id*.) He started homeschooling in third grade. (*Id*. at 58.) He went back to a classroom setting for fifth and sixth grade, and then back to homeschooling in seventh grade. (*Id*.) He liked homeschooling better because the social interactions felt more genuine. (*Id*.)

- He has panic attacks two to three times per week. (*Id*. at 49.) Panic attacks last two to three hours to a whole day. (*Id*.) He has racing thoughts, difficulty breathing, and crying spells. (*Id*.) He gets very angry, yells and screams, and rarely has thrown things. (*Id*.)

13

- His OCD requires him to frequently wash his hands, which in turn causes eczema on his hands. (*Id*. at 50.) The OCD also causes mood changes due to intrusive thoughts. (*Id*.) The intrusive thoughts are disturbing, like wanting a family member to die. (*Id*.) Sometimes he says he wants his mom or dad to die, but he doesn't want them to die and doesn't know what he would do without them. (*Id*. at 61.) The thought of being out of the house and doing things on his own scares him. (*Id*. at 62.)

- He has ADHD. (*Id*.) He does not take medication for it. (*Id*. at 50) He takes about 8 to 10 medications related to his behavioral health issues every day (*Id*. at 51.) Someone reminds him how to take the medication. (*Id*.) He currently does not have any side effects to the medications he is on. (*Id*.) His anxiety impacts his ability to sleep. (*Id*.) Sometimes he gets about 5 hours of sleep in a night, sometimes he just stays up. (*Id*.) One to two days a week he stays up through the night watching TV. (*Id*. at 51-52.)

- He has a new treatment that he is trying to manage his anger, stress, and panic attacks. (*Id*. at 52.) It is a six-week program, Monday through Thursday, 9:00 a.m. to 12:00 p.m. (*Id*.) It starts next week. (*Id*. at 53.)

- He sees a counselor once every week and a psychiatrist once every two weeks. (*Id*.) He attends appointments virtually. (*Id*.)

- He used to have a CT scan yearly to check his liver, but now has a CT scan every six years. (*Id*.) He has scar tissue on his liver from birth. (*Id*.) He has fatigue but does not attribute it to his liver. (*Id*.)

- On a typical day he watches TV, sits on his computer, and browses the internet. (*Id*. at 54.) He binge watches shows. (*Id*.) He watched YouTube videos for a few hours at a time. (*Id*.) He plays video games, listens to music, and makes music through his computer. (*Id*. at 55.) He will work on making music for two to three hours at a time. (*Id*.)

- He sees his sister every couple of weeks. (*Id*.) He does not see friends but does interact with his next-door neighbors. (*Id.*) He does not like to leave the house because when he is out for three to five hours, he starts to get overstimulated and panics. (*Id*. at 55-56.) Last year he went with his family to Kalahari. (*Id*. at 56.) It was crowded and noisy but he was able to handle it because he became accustomed to it. (*Id*.) He does not want to leave the house, and his dad says it "ruins the trip" when he goes to McDonalds with his dad to pick up food. (*Id*. at 59.) When he was in high school he went on a class trip with other homeschooled kids to Washington, D.C. (*Id*. at 60.) At the Smithsonian, he was tired and didn't want to walk anymore and started screaming "F you" and that he wanted to go back to the hotel. (*Id*. at 60-61.)

14

• He recently started getting a stiff neck sometimes. (*Id*. at 57.) He has not addressed it with his doctors. (*Id*.) He handles it by taking Aspirin, using a heating pad, and moving his neck. (*Id*.)

The VE testified Calo has no past work. (*Id*. at 63.)  The ALJ then posed the following hypothetical question:

> With any hypothetical question, I want you to assume someone of Mr. Calo's age, his education, and vocational background. Now, the first hypothetical individual would be at the medium exertional range. He would have the following additional non-exertional limitations. He could perform simple, routine, repetitive tasks, but would not be able to perform tasks which required a high-production-rate pace, for example such as assembly line work. He could make only simple, work-related decisions, and should not be responsible for the safety or welfare of others. Now, he could have customary interaction with supervisors and occasional interaction with co-workers in a non-public work setting. Now, he should be limited to superficial contact, and let me define that as meaning no group, tandem, or collaborative tasks, no management, direction, or persuasion of others. Now, this individual could respond appropriately to only     occasional change in a routine and relative static work setting. And major changes would need to be easily explained and/or demonstrated in advance of gradual implementation. Would there be medium, unskilled jobs for that first hypothetical individual?

(*Id*. at 64-65.)

The VE testified the hypothetical individual be able to perform other representative jobs in the economy, such as a floor waxer, auto detailer, and car cleaner.  (*Id*. at 64.)

The ALJ asked:

> Now, what if, as a second hypothetical, I reduce that social interaction to effectively isolation? They could still have that interaction with supervisors in a non-public work setting, but could have no interaction or contact with either co-workers or the general public. What impact would that have on the jobs you just identified?

(*Id*. at 65.) The VE responded that working in isolation would not be considered competitive in nature, and therefore would be work preclusive. (*Id*.) The ALJ asked what impact on the previously identified jobs it would have if the individual would occasionally need redirection or extra supervision to stay on task. (*Id*.)

15

The VE testified that it would be appropriate during the first 30-to-90-day introductory period, but after that it would be work preclusive. (*Id*. at 66.) The ALJ asked whether individuals would be expected to do their own goal setting and planning. (*Id*.) The VE responded that goal setting and planning would be at the direction of the supervisor. (*Id*.) With regard to allowable time off work and absenteeism, the VE testified an individual can be off task no greater than 14 percent of the workday, and an individual can miss up to one day per month during an introductory period, and miss up to one and one half days per month thereafter. (*Id*. at 66-67.) The ALJ asked about breaks and the VE testified that breaks may be defined by state wage and hour laws, but typically consist of a 15-minute break after the first two hours, a meal break lasting 30 minutes to one hour, and another 15-minute break about two hours after lunch. (*Id*. at 67.) Individuals can be accommodated with two to three unscheduled breaks lasting five minutes each. (*Id*.)

Calo's attorney asked:

> . . . if a hypothetical individual in a competitive workplace would struggle with maintaining concentration, time management, and decision-making at times of increased stress, and that they would need a structured and predictable work setting, where major changes are explained or even require supervisory support with goal setting and planning, how do those limitations impact unskilled work?

(*Id*. at 69.) The VE explained:

> Well, the Judge has already addressed changes in a routine and predictable work setting explained and demonstrated in advance, and he's already addressed the issue of goal setting or planning, which would be done by a supervisor. And I guess, in unskilled work, its relatively structured and predictable, because that would be addressed in simple, routine, and repetitive work.

(*Id*.) Calo's attorney followed up, asking if increased stress happened occasionally and interfered with the whole day, what effect that would have. (*Id*. at 70-71.) The VE testified that stress is not vocational terminology, yet none of the jobs she listed in response to the ALJ's hypotheticals would be considered

16

stressful. (*Id*. at 71.) The VE stated that if an individual experienced mental health issues to the extent they could not attend to their tasks for two-hour segments, that would be work preclusive. (*Id*.)

### III. STANDARD FOR DISABILITY

The Social Security Act mandates the satisfaction of three basic criteria to qualify a child for surviving child's insurance benefits of an insured, namely, the child must: (1) have filed an application for such benefits; (2) have been unmarried at the time of the filing and must have been either: (i) under eighteen years of age or a full-time elementary or secondary school student under nineteen, or (ii) under a disability which began before age 22; and (3) have been dependent upon the deceased parent at the time of the parent's death. 42 U.S.C. § 402(d)(1). In the present case, the only issue raised by the parties relates to whether Plaintiff was "under a disability which began before age 22."

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4)*, * 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart

17

P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. Born on April 16, 2002, the claimant had not attained age 22 as of April 16, 2002, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2. The claimant has not engaged in substantial gainful activity since April 16, 2002, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: obesity, liver lesion/abnormal liver function tests/non-alcoholic fatty liver disease/hepatic steatosis/focal nodular hyperplasia of liver [hereinafter, collectively, the "liver impairment"], major depressive disorder, generalized anxiety disorder, panic disorder, social phobia, obsessive-compulsive disorder, autism spectrum disorder, attention deficit-hyperactivity disorder, and agoraphobia with panic disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that the claimant is limited to the performance of simple, routine, repetitive tasks and to the making of no more than simple, work-related decisions, conducted in a work setting that would impose no responsibility upon the claimant for the safety or welfare of others and that would be free of high production-rate pace [as is found in assembly line work], which setting is non-public, imposes customary, superficial [defined as precluding group, tandem, or collaborative tasks, as well as tasks involving the management, direction, or

18

persuasion of others] interaction with supervisors, and occasional and superficial interaction with co-workers, which setting is routine and relatively static, in that it contemplates no more than occasional changes, and affords gradual implementation of major changes in the workplace, after easy explanation and/or demonstration.

6.  The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on April 16, 2002, and was 0 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 16, 2002, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(Tr. 13-24.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human*

*Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No.

20

11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In his sole assignment of error, Calo argues the ALJ's RFC is not supported by substantial evidence and his reasoning for "rejecting the limitations of the treating physician is legally insufficient." (Doc. No. 7 at 17.) Calo contends the ALJ failed to explain the factors he used when evaluating the opinion of Lisa Hrina, CNP[4], and the reasoning was "scant and contradictory to the actual evidence of record." (*Id*. at 18.) Calo states the ALJ mischaracterized evidence and ignored other probative evidence, including emergency department visits. (*Id*. at 19.) Calo argues the ALJ failed to acknowledge Calo's mental health treatment was typically virtual. (*Id*. at 20.) Calo claims the ALJ did not mention or downplayed evidence that showed Calo's functional problems, like the use of the GAF score and Calo's urethral stricture treatment. (*Id*. at 20-21.) Calo cites to evidence that he admits is outside the relevant period, but contends it shows support for Ms. Hrina's opinion. (*Id*. at 21-23.) Calo asserts the ALJ's opinion does not "build a logical bridge" because the ALJ determined Calo suffers from agoraphobia, yet the ALJ does not provide for him being absent from work or needing extra breaks. (*Id*. at 23-24.)

The Commissioner responds the ALJ considered Calo's allegations and self-reports, the treatment records, the opinion evidence, and prior administrative medical findings in the record to determine Calo was capable of unskilled work with social restrictions. (Doc. No. 9 at 8.) The Commissioner argues that the ALJ

---

[4] As noted by the ALJ and in the Commissioner's brief, the signature and credential of a medical opinion is illegible (Tr. 941), but the ALJ stated "the opinion may be attributed to Ms. Hrina, CNP, the claimant's psychiatric provider." (Tr. 22.) As the parties have continued to refer to the opinion as Ms. Hrina's to avoid confusion, the Court will do the same.

complied with the requirements of 20 C.F.R. § 404.1520c when evaluating the medical source statement attributed to Ms. Hrina. (*Id*.)  The Commissioner states the ALJ properly found Ms. Hrina's opinion was not supported by objective evidence because Calo was able to keep appointments and fully participate in his own treatment and planning. (*Id*. at 9.) The Commissioner claims the ALJ noted less restrictive findings of the state agency psychological consultants, that providers documented a full fund of knowledge, fair-to-good memory, attention and concentration, and generally logical thought process notwithstanding mood problems. (*Id*. at 9.) The Commissioner notes the ALJ cited records describing Calo as calm and cooperative and detailed socialization, and spending time at movies, restaurants, an amusement park, and spending time with a girlfriend. (*Id*.) The Commissioner also noted the ALJ considered that Calo handled life stressors, such as a household move, a breakup, and a rejected date request. (*Id*.) The Commissioner asserts the ALJ properly considered the above evidence in the context of both supportability and consistency. (*Id*.)

The Commissioner contends the ALJ was not required to use the words "supportability" or "consistency" in his opinion. (*Id*. at 10.) The Commissioner asserts the ALJ's opinion "reflects a reasonable weighing of the evidence and overall record." (*Id*.) The Commissioner notes the ALJ looked at the same evidence cited by Calo and simply reached a different conclusion. (*Id*.) Despite Calo's assertion to the contrary, the ALJ did cite to the emergency department records where Calo was seen for suicidal thoughts. (*Id*. at 9-10.) The Commissioner argues Calo faulting the ALJ for not including that much of his mental health treatment was virtual, is misplaced because Calo continued to see medical providers in person for other issues and by his own reports engaged in activities outside the house. (*Id*. at 11.) The Commissioner claims Calo "simply wishes the ALJ had weighed the evidence differently." (*Id*.)

In reply, Calo argues the Commissioner's brief is "not an accurate portrayal of medical findings." (Doc. No. 10 at 1.) Calo reiterates that the ALJ's opinion did not build a logical bridge between the evidence and the conclusion reached because he found severe mental health impairments yet did not account for Calo

22

missing a day of work. (*Id*. at 2.) Calo argues the Commissioner engages in "impermissible *post hoc* rationalization" of the ALJ's reasoning and that the ALJ's reasoning must be articulated by the agency itself. (*Id*. at 3.) Calo claims the social activities cited by the ALJ were activities initiated by Calo's parents and he was "resistant to leave the house." (*Id*. at 4-5.) Calo maintains it does not make sense for the ALJ to find agoraphobia and fail to include in the RFC limitations that could be expected from the condition, like being absent from work and needing additional breaks. (*Id*. at 6.)

Since Calo's claim was filed after March 17, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[5] (2) consistency;[6] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other

---

[5] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[6] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

24

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed Ms. Hrina's opinion as follows:

> Ms. Hrina indicated that the claimant would have marked-to-extreme limitations in each of the four psychologically based, work-related areas of function, that he would be off-task more than 20% of the time, would be absent more than four times per month, and would need unscheduled breaks of more than one hour's length, four times per day. Ms. Hrina has treated the claimant over an extended period and is reporting within the bounds of her professional certifications. However, her record shows that the claimant has generally presented as and when appointed, and has typically given notice when he is unable to keep his appointments. He has proven able to fully participate in his own treatment and planning, without the need of additional breaks. There is no real objective basis for her opinion regarding the claimant's need for breaks, his absenteeism, or off-task behavior. Her opinion overstates, to significant degree, the claimant's limitations in the four, psychologically based, work-related areas of function, by comparison to the overall evidence of record, described in digest form in the preceding paragraph. This opinion is only minimally consistent with, and supported by, the evidence of record and is not persuasive.

(Tr. 22.) In the "preceding paragraph" cited by the ALJ, he extensively weighs the evidence of record, including medical evidence concerning psychological disorders and symptoms, evidence of social interaction, and evidence of ability to handle stress, to consider Calo's cognitive, social, and adaptive limitations. (*Id.* at 21-22.) The ALJ wrote, in part:

> . . . The record shows a claimant with multiple psychological disorders and known difficulties with reading comprehension (1E/16). These would be expected to, the claimant reports (6E/6), and the record supports (3F/14) do, impose at least episodic deficits of understanding and memory. However, the claimant is of average native intellect (1F/13), retains a good fund of knowledge over time (3F/70), (19F/9), with reliably fair-to-good memory

25

(3F/93, 39), (14F/9), with reliably fair-to-good attention and concentration (3F/93, 39), (19F/9), and a generally logical thought process (3F/93, 23), (14F/3). These faculties often persist, even if the claimant is discernibly symptomatic of mood (14F/29, 3). Provided the claimant is limited to the performance of simple, routine, repetitive tasks, conducted free of the need to mull complex decisions, adhere to anxiety- or frustration-inducing production pressures, or bear anxiety- or frustration-inducing responsibilities for the well-being of others, the evidence shows he has retained sufficient, residual, cognitive function to engage in competitive work. The claimant has described significant difficulties being around others (6E/1, 6), and some treatment notes describe the claimant as making an off-putting social presentation (3F/35), (8F/43), (14F/3). However, he does describe regular socialization with others across all forms of media, including in-person (6E/5), (3F/47, 34). He denies significant difficulties responding to authorities (6E/6), was responsive to me during the hearing [hearing testimony] and has been responsive to treating source direction (19F/12). He is discernibly able to function in public settings, including during membership in an autism social group (14F/33), at the natatorium at which he holds a membership (19F/18), at graduation parties, including his own (3F/47, 53), at movies (3F/34, 38), restaurants (3F/18), tattoo parlors (3F/30), amusement parks (3F/22), bowling alleys (3F/64), and casinos (14F/14). He has had a girlfriend (3F/18), and generally presents in the record in "pro-social" terms: calm, cooperative, with good eye contact (3F/93, 80, 70, 55), (16F/58), as quiet, calm, cooperative (3F/39, 23), with normal mood, affect, and behavior (4F/14, 12). Even if demonstrably symptomatic of mood, he generally remains talkative and cooperative (14F/3, 29), (19F/9). Provided he is not asked to work with or around the public, where the potential for emotional escalation in the intensity of his interact with supervisors and co-workers would be controlled, and where his interaction with co-workers would further be controlled by limiting its frequency, the evidence shows the claimant has retained sufficient, residual, social function to engage in competitive work. The claimant has described significant difficulties responding to changes and stressors (6E/7) and some treatment notes describe limited insight and judgment (3F/4). The evidence also shows an emergent visit for a panic attack accompanied by suicidal ideation; however, the claimant was stabilized short of admission (16F/59). Otherwise, the claimant's mental status examinations have not materially deteriorated (3F/93) *compare with* (3F/39) and (19F/19), despite changes and stressors including the movement of his household from Streetsboro to Stow (3F/93, 31), or a break-up with his girlfriend (14F/6). He was recently turned down for a date but took the rejection in stride (14F/33). His insight and judgment are generally described in the treatment record as fair-to-improving-to good and/or appropriate (3F/93, 80, 70, 55, 39, 23), (14F/3, 29), (19F/9), (4F/4, 12). These faculties generally persist, even if the claimant is discernibly symptomatic of mood (14F/3, 29). Provided the claimant is limited to the performance of simple, routine, repetitive tasks,

> conducted free of the need to mull complex decisions, adhere to anxiety- or frustration-inducing production pressures, or bear anxiety- or frustration-inducing responsibilities for the well-being of others; where he would not be subjected to constant change, and where significant change would be gradually integrated into the work routine following advance, easy, explanation and/or demonstration, the record shows the claimant has retained sufficient, residual, adaptive capacity to engage in competitive work. . .

(Tr. 21-22.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. § 404.1520c(a). The ALJ considered the supportability and consistency of Ms. Hrina's opinions, discussing that the extreme limitations are not consistent with the fact that Calo has presented to appointments, given notice when unable to attend, has fully participated in his treatment and panning of same, without the need for additional breaks. (Id. at 22.) The ALJ noted that Ms. Hrina's opinion of Calo's limitations are significantly overstated as compared to the overall evidence of the record. (Id.) The evidence the ALJ points to consists of treatment notes stating Calo has some deficit of memory and understanding, average intellect, good fund of knowledge, fair-to-good memory, fait-to-good attention and concentration, generally logical thought process, some difficulty being around others, regular socialization across all forms of media, no difficulty responding to authority, able to function in public settings, generally presents as quiet, calm, cooperative, with normal mood, affect, and behavior, has potential for emotional escalation when with or around the public, and he is able to respond and handle stressful situations, including a move and a breakup. (Id. at 21-22.) While the ALJ here did say the "opinion is only minimally consistent with, and supported by, the evidence of the record . . ." (Tr. 22) there is no requirement that an ALJ use the terms 'supportability' or 'consistency' in his analysis. *Adams v. Comm'r of Soc. Sec.*, No. 1:21-CV-02199-PAB, 2023 WL 2373541, at *6 (N.D. Ohio Jan. 23, 2023), report and recommendation adopted sub nom. *Adams v. Kijakazi*, No. 1:21CV2199, 2023 WL 2347368 (N.D. Ohio Mar. 3, 2023). Here, the ALJ assessed both the supportability and consistency of Ms. Hrina's opinion,

considering the extreme limitations in the report compared to Ms. Hrina's own record and the overall evidence of record.

It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here.  While Calo would weigh the evidence differently, it is not for the Court to do so on appeal.

There is no error.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: November 24, 2025

_s/ Jonathan Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  _Berkshire v. Beauvais_, 928 F.3d 520, 530-31 (6th Cir. 2019).**